UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------X

MIRIAM KAWACHE, an infant, by her parents
and natural guardians, Serena Kawache and
Adam Kawache,

        Plaintiffs,

  - against –

THE UNITED STATES OF AMERICA,

        Defendant.

-----------------------------------------X

FOR ELECTRONIC
PUBLICATION ONLY

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

08-CV-3128 (KAM) (SMG)

**MATSUMOTO, United States District Judge:**

      Serena Kawache ("Ms. Kawache") and Adam Kawache ("Mr. Kawache") commenced this action on behalf of their minor child, Miriam Kawache ("Miriam") (collectively "plaintiffs") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671 et seq. ("FTCA"), seeking damages from the United States ("defendant") for a birth injury sustained by Miriam Kawache and allegedly caused by the delivering physician's departure from the applicable standard of medical care. (See ECF No. 9, Joint Pre-trial Order ("PTO") at ¶ 2.) Specifically, plaintiffs claim that a deemed employee of the United States, Dr. Ahmad M. Jaber, M.D. ("Dr. Jaber"), departed from the applicable standard of medical care when attending to the birth of Miriam Kawache on December 12, 2005 because, when confronted with the birth complication of shoulder dystocia, Dr. Jaber failed to perform the appropriate obstetrical maneuvers and instead applied

excessive lateral traction to the infant's head and thereby caused the child's permanent Erb's palsy injury, also known as a brachial plexus injury.[1] (Id.)  The claim was tried before this court between May 11 and May 13, 2010.  (See generally, Tr.)[2]

Having considered the evidence at trial, assessed the credibility of the witnesses, and reviewed the post-trial submissions of the parties,[3] the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure[4] ("Rule 52") and ultimately concludes, for the reasons set forth below, that plaintiffs have failed to prove that the United States is liable for the injuries sustained by their daughter.

---

[1]    The brachial plexus is a network of nerves that branch out from the cervical spine and enervate the muscles of the shoulders and the arms. (Bench Trial Transcript at 156-57.)  An injury to the brachial plexus causes a weakness in the affected upper extremity.  (Id. at 157.)

[2]    Citations to the bench trial transcript from 5/11-13/2010 are designated "Tr."

[3]    The post-trial submissions of the parties included: ECF No. 36, Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pls. Mem.") dated 5/14/2010; and ECF No. 37, Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. Mem.") dated 6/22/2010.  Because plaintiffs' five-page proposed findings contain neither paragraph nor page numbers, the pagination references to plaintiffs' memorandum herein are supplied by the court.

[4]    Rule 52 provides, in relevant part, that following a bench trial, "the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52.

## FINDINGS OF FACT

### A. Background

#### 1. Shoulder Dystocia

Shoulder dystocia, in simplest terms, is defined as a "difficult delivery of [a baby's] shoulders" during a vaginal delivery. (Tr. at 211.) Specifically, according to plaintiff's medical expert, shoulder dystocia occurs when a baby's "head has exited the vaginal canal and the shoulders are stuck . . . so the baby can't deliver because the shoulders are impeding the progress of the baby." (Id. at 210.) The shoulders impede the baby's progress in this situation because the shoulders are "held in two positions," in that the baby's anterior (top) shoulder is stuck behind the mother's pubic bone, while the baby's posterior (bottom) shoulder is stuck behind the mother's sacrum (tail bone). (Id. at 80, 210, 367, 491; see also Ex. I.)

Shoulder dystocia is recognized by obstetricians when "[t]he head comes out and the shoulders just don't follow," thereby interrupting the birth. (Tr. at 367.) In medical parlance, this event is often referred to as the "turtle-sign" because the appearance of the baby's head from the vaginal canal and then retracting upon the impaction of the baby's shoulders resembles a turtle retracting its head into its shell. (Id. at 90, 210-11.)

## 2. Proper Treatment of Shoulder Dystocia: The McRoberts Maneuver and Supra-Pubic Pressure

Shoulder dystocia is a dangerous birth complication because without quick treatment it could lead to the impacted infant being be stillborn or being born brain dead. (See Tr. at 223-24.) There is no dispute as to the proper standard of care for treating this complication as the parties agree that when shoulder dystocia occurs, a doctor must attempt to perform certain maternal maneuvers in an attempt to dislodge the infant's shoulders. (Id. at 212, 247-48, 360, 369.) The maternal maneuvers that should first be utilized by obstetricians confronting shoulder dystocia are the McRoberts maneuver and supra-pubic pressure (herein, the "maternal maneuvers"). (Id. at 212, 247-48, 360, 369.) These maneuvers are attempted first because they are the "simplest to do" in that they are "the least traumatic" and the "least manipulative." (Id. at 369.) Moreover, these maneuvers resolve ninety percent of shoulder dystocia cases. (Id.)

The McRoberts maneuver involves flexing the mother's knees towards her chest wall in order to change the angle of the mother's tail bone. (Id. at 212, 214-15; see also id. at 80.) By flattening the tail bone, the maneuver provides more space in the mother's pelvic area, enabling the infant's impacted shoulders to dislodge and the delivery to continue through the

vaginal canal. (Id. at 212, 214-15; see also id. at 80.) The McRoberts maneuver is usually performed with the assistance of a healthcare worker or family member pushing back the mother's legs although it is possible, regardless of whether or not the mother has had an epidural block,[5] for the mother herself to accomplish the maneuver. (Id. at 232-33, 364-65.)

Supra-pubic pressure involves the application of pressure with the palm or fist of one hand just above the mother's pubic bone. (Id. at 81, 212, 375.) The purpose of this technique is to push the infant's impacted anterior shoulder down below the mother's pubic bone so that the shoulder can be dislodged and the delivery can proceed. (Id.) Generally, supra-pubic pressure is performed by either a nurse or resident assisting the delivering physician. (Id. at 375.)

In the "rare" event that the McRoberts maneuver and supra-pubic pressure fail to dislodge the infant's impacted shoulders, a physician may employ additional maneuvers and techniques in an attempt to successfully deliver the infant vaginally. (Id.; see also id. at 212-15.) Such additional

---

[5] Epidural anesthesia is a type of regional anesthesia commonly used to prevent pain during childbirth. See Medline Plus Medical Encyclopedia, a service of the U.S. National Library of Medicine, U.S. Department of Health and Human Services, National Institutes of Health ("Medline Plus"), available at http://www.nlm.nih.gov/medlineplus/ency/article/007280.htm (last visited February 7, 2011). The anesthesiologist injects the medicine into the lower back in the area surrounding the spine, causing the patient to lose feeling in the lower half of the body while remaining awake. Id.

maneuvers may include the Woods maneuver, the Woods Screw maneuver, the posterior arm maneuver, and the Gaskin maneuver, none of which are relevant here. (Tr. 212-15.) Ultimately, if none of the foregoing maneuvers succeed, a physician may either resort to the use of excessive lateral traction or to cephalic replacement, neither of which was employed here, which involves pushing the infant's head back into the birth canal in order to perform an emergency cesarean section. (Id. at 223-24.) Notably, upon recognition of shoulder dystocia and prior to the use of the McRoberts maneuver and supra-pubic pressure, application of excessive lateral traction to the infant's head is a departure from the standard of care. (Id. at 230, 403.)

### 3. Dr. Jaber's Training and Experience

Born and raised in Palestine, Dr. Jaber's native language is Arabic. (Id. at 78.) Dr. Jaber attended medical school at Mosul University in Iraq, graduating in 1972. (Id.) After a short period practicing medicine in Amman, Jordan, Dr. Jaber moved to this county in 1974 and completed additional medical training including an internship at Flushing Hospital Medical Center in Queens and a residency program in obstetrics and gynecology at Lutheran Medical Center in Brooklyn. (Id. at 79.)

Dr. Jaber has been board certified in obstetrics and gynecology since 1982 and has practiced as an obstetrician and

gynecologist ("ob/gyn") in this country for over thirty years.
(Tr. at 79.) During that time, Dr. Jaber has attended nearly
5,000 deliveries including more than twenty-five deliveries
involving the complication of shoulder dystocia. (Id. at 54,
79-80.) At all times relevant to this action, Dr. Jaber was a
"deemed employee" of the Sunset Park Family Health Center
Network, a federally funded health center. (Id. at 34; PTO ¶
8(d).)

### 4. History of Dr. Jaber's Treatment of Ms. Kawache

Among the deliveries attended by Dr. Jaber was the
delivery of Ms. Kawache's first child, Yusuf. (Id. at 34.)
Yusuf Kawache was born without complication in January 2002.
(Id.) During Ms. Kawache's second pregnancy, Dr. Jaber provided
prenatal care to Ms. Kawache in partnership with a midwife.
(Id. at 36, 81.) Ms. Kawache's mother, Rosanne Sinti ("Ms.
Sinti") accompanied Ms. Kawache on more than one prenatal visit
to Dr. Jaber. (Id. at 126.) During one visit, Ms. Sinti asked
Dr. Jaber to write a doctor's note requesting Visiting Nurse
Services for Ms. Kawache because Ms. Kawache was suffering from
depression. (Id. at 81, 83, 126; Ex. A at D 19, D 21; see also
D 30, D 32-33, D 45-47.) Dr. Jaber refused to provide a
referral for the Visiting Nurse Service on the grounds that
there was no obstetrical need for additional nursing services at
that point in Ms. Kawache's pregnancy. (Tr. at 84.) Rather,

Dr. Jaber suggested that such a referral might be available from the psychiatry department given that the reason for the requested additional care related to Ms. Kawache's mental health. (Id.)  Ms. Sinti testified that she felt "very disappointed" and "hurt" when Dr. Jaber refused her request. (Id. at 127-28.)

Ms. Kawache's prenatal care was otherwise uneventful. Ms. Kawache's uterus bore no signs of malformation. (Id. at 34-35, 177, 428.)  Additionally, the three ultrasounds performed during the course of Ms. Kawache's pregnancy with Miriam indicated no congenital anomalies with the fetus. (Id. at 35, 37.)

**B. Delivery**

**1. Evidence**

According to the medical records, Ms. Kawache was admitted to Lutheran Medical Center on December 12, 2005 at 7:45 a.m. in early labor.[6]  (Ex. A at D 30.)  Ms. Kawache's delivery team consisted of Dr. Jaber, an ob/gyn resident named Dr. Rosenberg, a labor and delivery nurse named Patricia Wuensch, a senior resident whose name is unknown, and other assistants. (Tr. at 37, 40, 47, 88-89.)  All of these persons were present in the delivery room during the delivery.  (Id.)  Also in the

---

[6]     Although Ms. Sinti testified that she took Ms. Kawache to the hospital after her water broke "between 10:00 and 10:30 a.m." (Tr. 111-12), the medical records contradict this testimony (see Ex A at D 28, D 30), and the court credits the contemporaneously recorded medical records.

delivery room was Ms. Kawache's mother, Ms. Sinti, who accompanied her daughter to the hospital and stayed with her through the delivery. (Tr. at 111-12, 132.) A friend of Ms. Kawache named Eman, who now resides in Egypt according to Ms. Sinti, was also present for the delivery of the baby. (Id. at 113.) Ms. Kawache's husband, Adam Kawache, was not present during the delivery because he was caring for the couple's older child, Yusuf, and dealing with the aftermath of a fire which occurred in the couple's apartment earlier that morning while Ms. Kawache was in labor. (PTO at ¶ 8(f); Tr. at 121-22.) Plaintiffs presented eyewitness testimony from Dr. Jaber, Ms. Sinti, and Ms. Kawache.

There is no dispute regarding the early stages of Ms. Kawache's labor which progressed normally without any signs of fetal distress or maladaption, which occur when the fetus presents in an unusual position. (Id. at 35.) Dr. Jaber came into the delivery room to check on Ms. Kawache on at least three occasions after her arrival. (Id. at 133-34.) Dr. Jaber returned to the delivery room at approximately 6:45 or 6:50 p.m. when Ms. Kawache was "quite dilated." (Id. at 134.) At that time, the nurses began to prepare Ms. Kawache for delivery. (Id.) Ms. Kawache was placed into the lithotomy position, which entailed her lying on the delivery bed with her knees resting on top of stirrup pads so that her knees were at a ninety degree

angle relative to her hips and torso.  (Id. at 87-88, 366; see also Ex. A at D 36.)  In this position, both Ms. Kawache's legs and the stirrup pads supporting her legs were covered by a sterile drape.  (Tr. at 134-135, Ex. A at D 36.)

At approximately 7:00 p.m. the baby's head presented through the vaginal canal.  (Tr. at 87.)  At the moment that the baby's head presented, Dr. Jaber was standing between Ms. Kawache's legs, with her knees supported in the stirrup pads in the lithotomy position on either side of Dr. Jaber's shoulders.  (Id. at 58, 88.)  The delivery nurse was standing behind Dr. Jaber, and the resident, Dr. Rosenberg, was standing to Dr. Jaber's right.  (Id. at 58.)  As noted by Dr. Jaber in a delivery note completed roughly fifteen to twenty minutes after the birth, the infant's head presented in the right occiput anterior ("ROA") position.[7]  (Id. at 89, 95-97; see also Ex. A at

---

[7]    Although a Labor and Delivery Report related to Miriam Kawache's birth bears a check-box indicating that the baby presented in the "LOA" (left occiput anterior) position (see Ex. A at D 55) as opposed to the ROA position as noted by Dr. Jaber (see Ex. A at D 36), the court accepts the delivery note contemporaneously recorded by Dr. Jaber.  As a board certified ob/gyn with over thirty years experience who was standing directly between Ms. Kawache's legs and facing the vaginal canal when the head presented, the court finds that Dr. Jaber had both the training and experience to identify and accurately document the correct position of the baby as well as the opportunity to do so from his position in the delivery room.  Moreover, plaintiffs failed to establish the identity of the person who filled in the Labor and Delivery Report and whether that person had any personal knowledge of the baby's head presentation during delivery.  (See id.; see also Tr. at 49-51.)  Indeed, Dr. Jaber testified credibly that such Labor and Delivery Reports are frequently completed by multiple individuals including the delivery nurse, resident, and attending physician (id. at 49), and plaintiffs' own expert acknowledged that it would be unlikely for a nurse completing such a form to have personal knowledge of the baby's position (id. at 219).  Accordingly, the court credits Dr. Jaber's delivery note and finds that the baby presented in the ROA position.

D 36.)  In an ROA presentation, the baby's left shoulder is facing up, with the occiput, or back, of the baby's head closest to the mother's right side and the front of the baby's head facing the mother's left side.  (Tr. at 47.)

Dr. Jaber testified that he had no specific recollection of Miriam Kawache's delivery, and accordingly, his testimony regarding the events of that day was based upon his review of the medical records.  (Id. at 34.)  Dr. Jaber also testified regarding his usual practice when he recognizes shoulder dystocia during a delivery.  (Id. at 80.)  Specifically, once he deduces that shoulder dystocia is occurring, it is Dr. Jaber's practice to direct the delivery team to perform the McRoberts maneuver and apply supra-pubic pressure.  (Id.)

When the baby's head presented, Dr. Jaber testified that he placed his hands upon the baby's head but did not apply any traction whatsoever – either upward or downward.[8]  (Id. at

---

[8]     The record belies plaintiffs' assertion that "upon direct questioning" by plaintiffs' counsel Dr. Jaber testified that "when the baby's head appeared" he placed his hands upon the baby's head and applied downward traction.  (Pl. Mem. at 4 (emphasis in original) (citing Tr. at 61).)  First, Dr. Jaber's testimony showed that during the delivery he placed his hands on the baby's head not once but twice: first when the baby's head initially crowned (tr. at 90), and again after the proper maternal maneuvers had been performed (id. at 92-94).  Yet, notwithstanding the underlined timeframe asserted in the text of plaintiffs' post-trial memorandum of law (see Pl. Mem. at 4 ("when the baby's head appeared")), the question actually posed by plaintiffs' counsel at trial and relied upon by plaintiffs provide no specific timeframe, but instead refers ambiguously to the moment "when" Dr. Jaber placed his hands on the baby's head (see tr. at 61 (". . . Doctor, isn't it true that when you put your hands on the baby's head that you pushed down on the baby's head . . . ?") (emphasis added)).  Moreover, after

90, 93.)  While his hands were on the baby's head, Dr. Jaber
immediately recognized the so-called turtle sign because the
baby's head appeared to retract into the vagina.  (Id. at 89-
90.)  This sign indicated to Dr. Jaber that shoulder dystocia
was potentially occurring.  (Id.)

Upon recognition of potential shoulder dystocia, Dr.
Jaber testified to following his typical procedure.
Specifically, Dr. Jaber testified that when he saw the turtle
sign, he asked for help from the delivery team to perform the
McRoberts maneuver.  (Id. at 90-91.)  Because Ms. Kawache was
already in the lithotomy position with her knees supported by
stirrups, she was "practically already" in the McRoberts
position.  (Id. at 91.)  Thus, accomplishing the McRoberts
maneuver took only seconds and required merely "add[ing] more
flexion to the [mother's] knees" by "push[ing] [them] back while
[the legs were] still . . . in the stirrups . . . . towards the
chest of the mother and a little bit outward."  (Id. at 91.)
While Ms. Kawache was in the McRoberts position, Dr. Jaber
instructed the senior resident to apply supra-pubic pressure in

responding to that question, Dr. Jaber immediately asked for a chance to
clarify his response.  (Id. at 62.)  When provided with that opportunity
during his examination by defendant, Dr. Jaber testified unequivocally that
his statement regarding the application of traction to the baby's head
referred to the second time he placed his hands on the baby's head,
specifically, the timeframe after he had recognized shoulder dystocia and
ensured that the proper maternal maneuvers had been performed.  (Id. at 343-
45.)  Accordingly, the court rejects plaintiffs' strained interpretation of
the record and instead credits Dr. Jaber's unambiguous testimony that he did
not apply traction to the baby's head when it first crowned, but did so only
after the maternal maneuvers had been performed.  (See Tr. at 90, 93, 345.)

an attempt to dislodge the baby's shoulder from under the mother's pubic bone. (Id. at 91-92.) While the senior resident was intermittently applying supra-public pressure, Dr. Jaber remained standing between Ms. Kawache's legs with his hands in front of him waiting for the baby's shoulders to become dislodged. (Id. at 92-93; see also Def. Ex. A at D 36, D 37.)

When Dr. Jaber observed the intermittent supra-pubic pressure beginning to dislodge the baby's shoulder and the baby's head moving further out of the vaginal canal, Dr. Jaber again placed his hands upon the baby's head and applied gentle, intermittent downward traction to the head for thirty to forty seconds. (Tr. at 92-94.) Dr. Jaber testified that he did not apply this pressure until after the mother was in the McRoberts position and the supra-pubic pressure was being applied. (Id. at 93.) Further, Dr. Jaber specified the pressure he applied to the baby's head was "gentle" and "not excessive," and consistent with the average pressure he usually employed during an uncomplicated vaginal delivery. (Id. at 94.) Dr. Jaber further testified that he did not apply excessive lateral traction to the baby's head at any time during the delivery. (Id. at 95.)

The combination of these maneuvers – the McRoberts position, supra-pubic pressure, and the 30 to 40 seconds of gentle, intermittent, downward traction – successfully dislodged the baby's shoulders and enabled the delivery to proceed. (Id.

at 95.) Dr. Jaber estimated that approximately one and one half minutes after he first recognized shoulder dystocia, the baby delivered. (Id.) Miriam Kawache was born at 7:02 p.m. weighing 4570 grams, or 10 pounds, one ounce, with Apgar scores of 9/9. (Id. at 72, 86; Ex. A at D 29, D 35, D 37, D 55, D 114, D 153; PTO ¶ 8(b).) The Apgar scores in this case confirm that the delivery was not protracted. (Tr. 224; see also Tr. 72; Ex. A at D 29.) Immediately after the delivery, Dr. Jaber testified that he held the baby by her feet upside down for suctioning and then handed the baby to the delivery nurse so that he could return his attention to Ms. Kawache and repair the episiotomy.[9]

The handwritten delivery notes recorded by Dr. Jaber approximately fifteen to twenty minutes after Miriam Kawache's birth support Dr. Jaber's credible testimony that he followed his usual procedure in this case. (Ex A at D 36.) Dr. Jaber testified that the delivery note was accurate, and that he did not fabricate or make up any of his notations, and that at the time he recorded the delivery note he was unaware that Miriam Kawache had suffered a brachial plexus injury because he did not examine the baby immediately after delivery and did not learn of

---

[9]    Episiotomy is a procedure in which the perineum, or skin between the vagina and anus, is cut in order to enlarge the vaginal opening so that a baby can be more easily delivered. See Medline Plus, available at http://www.nlm.nih.gov/medlineplus/ency/article/002920.htm (last visited February 7, 2011).

the injury until the following day.[10]  (Tr. 99-101.)  The

delivery note recorded by Dr. Jaber stated the following in

relevant part:

> . . . At the delivery of the vertex, I felt potential
> shoulder dystocia.  The pt (patient) was placed by
> chest knee position and supra-pubic pressure applied
> by the senior resident and a [illegible] baby girl
> delivered in ROA position, crying. . . .

(Tr. 97-98; Ex A at D 36.)  Dr. Jaber also clarified that when

he wrote "chest knee position" he was referring to the McRoberts

position as "chest knee" indicates the mechanics of the

McRoberts maneuver in which the mother's knees are flexed

towards her chest.  (Id. at 66, 81.)  In addition, Dr. Jaber

clarified that when he noted that he "felt potential shoulder

dystocia" he was referring to seeing the turtle sign, which

indicated the potential occurrence of shoulder dystocia.  (Id.

at 98.)  Thus, Dr. Jaber's note indicates that when he

recognized "potential shoulder dystocia," he and the delivery

team performed the McRoberts maneuver and applied supra-pubic

pressure.  (Ex. A at D 36.)

---

[10]    The court notes Ms. Sinti's testimony that approximately fifteen
minutes after Miriam Kawache's birth, she believes that Dr. Jaber informed
her that "there was a pull and that Miriam would be fine in three months,"
but that they did not have a conversation and that everything happened "quite
quickly."  (Tr. 119, 121.)  Plaintiffs did not present any evidence showing
that Dr. Jaber conveyed this information before Dr. Jaber recorded his
delivery note.  Nor did plaintiffs present any evidence contradicting Dr.
Jaber's testimony that he did not know the child had suffered a brachial
plexus injury at the time he recorded his delivery note.  (Cf. id. at 99-
101.)

The nursing notes also corroborate Dr. Jaber's account of the delivery. Two separate nursing notes confirm that Dr. Jaber was assisted during the delivery by the resident Dr. Rosenberg and the nurse Patricia Wuensch. (Ex. A at D 35, D 55; see also Tr. 375-76.) In addition, the contemporaneous nursing notes indicate in two places that Dr. Jaber identified shoulder dystocia during the delivery. Specifically, in the nurse's progress notes, following the delivery the nurse noted:

> . . . Live baby girl, apgar 9.9 born at 7:02 p.m. Delivered by Dr. Jaber with Dr. Rosenberg assisting. Shoulder dystocia at delivery per Dr. Jaber. . . .

(Ex. A at D 35.) Similarly, in the Labor and Delivery Report, "shoulder dystocia" was noted next to an entry labeled "Complications." (Ex. A at D 55.)

In her testimony, Ms. Sinti acknowledged that December 12, 2005 was a "very stressful day" for her and that she had a lot on her mind while her daughter was in labor. (Tr. 128.) Specifically, Ms. Sinti acknowledged the stress of receiving a phone call from her son-in-law while her daughter was in labor informing her that there had been a fire in Ms. Kawache's Brooklyn apartment while Ms. Kawache was at the hospital. (Id.) Prior to the delivery, on one occasion when Dr. Jaber entered the delivery room, Ms. Sinti testified that Dr. Jaber asked Ms. Sinti and her daughter, "who do you want to deliver the baby, the midwife or me?" (Id. at 113-14, 133.) Ms. Sinti responded

16

"you," and thought that Dr. Jaber's approach "seemed a little unprofessional." (Id. at 114-15.)

Ms. Sinti testified that she and Eman remained in the delivery room throughout the delivery. (113, 115, 132.) Ms. Sinti recalled specifically that Dr. Jaber returned to the room when it was time to deliver the baby. (Id. at 115.) At that time, Ms. Kawache's legs were placed in stirrups and Ms. Kawache was flanked by Ms. Sinti and Eman who stood near Ms. Kawache's abdomen on her left and right sides, respectively. (Id. at 115, 134.) Dr. Jaber was standing between Ms. Kawache's legs at the bottom of the bed. (Id. at 116.) From where she stood at Ms. Kawache's side, Ms. Sinti testified that she could not see the "birthing area" at all "because of the drape over the stirrups." (Id. at 134-35.) Specifically, Ms. Sinti could not see Dr. Jaber's hands during the delivery, and never saw Dr. Jaber's hands touch the infant's head during the delivery. (Id. at 128, 135.)

Ms. Sinti testified that after the delivery had been going "quite well," with the "usual discussion" occurring among the obstetrical team that would normally accompany a delivery. (Id. at 116-17.) Ms. Sinti testified that suddenly there was a brief pause and "everything went very quiet." (Id.) According to Ms. Sinti, this pause was "brief" and lasted "probably" a minute or less. (Id. at 117.) Ms. Sinti testified that she

17

then perceived a "pop" and that the baby was born.  (Id.)
According to Ms. Sinti, no one removed Ms. Kawache's legs from
the stirrups during the delivery, asked her or Eman to move away
from the delivery bed, or placed their hands upon Ms. Kawache's
abdomen and applied pressure there.  (Id. at 118.)

Ms. Kawache herself did not appear at the trial
because she had been admitted to the New York University
Hospital to receive mental health treatment.[11]  (Id. at 113.)
However, portions of Ms. Kawache's deposition testimony were
read into the record.  In that sworn testimony, Ms. Kawache
denied any recollection of her legs being moved or experiencing
pressure on any party of her body during the delivery, but she
explained that due to her mental health condition and treatment,
she remembered "nothing" about her pregnancy and the delivery of
Miriam.  (Id. at 138-40; see also Ex. B at 271.)

No other eyewitness testimony was presented to the
court.  However, expert witnesses for both plaintiffs and
defendant testified that in this case it appears that Dr. Jaber
recognized shoulder dystocia and that he and the obstetrical
team performed the appropriate maternal maneuvers, including the
McRoberts maneuver and supra-pubic pressure.

---

[11]     According to Ms. Sinti, Ms. Kawache's admitting diagnosis was "major
depressive disorder with deep personalization or disassociative features"
although the diagnosis had recently changed to "schizoaffective disorder."
(Tr. 125.)

First, plaintiffs' own ob/gyn expert Dr. Stuart Edelberg[12] ("Dr. Edelberg") testified – in contradiction to his own expert report – that based upon the medical records, Dr. Jaber and the obstetrical team performed the McRoberts maneuver and applied supra-pubic pressure during Miriam Kawache's delivery. (Tr. 234, 246-49, 250.) Dr. Edelberg also testified at trial that applying supra-pubic pressure and performing the McRoberts maneuver are not departures from the standard of care for treating shoulder dystocia during delivery. (Id. at 247-48.)

Second, defendant's ob/gyn expert Dr. Joseph Finkelstein ("Dr. Finkelstein")[13] testified that he believed that Dr. Jaber and his team diagnosed shoulder dystocia and both performed the McRoberts maneuver and applied intermittent supra-pubic pressure. (Id. at 360-61.) Dr. Finkelstein also based his expert opinion upon his review of the medical records. (Id. at 371.) Specifically, Dr. Finkelstein noted Dr. Jaber's contemporaneous delivery note which indicated that shoulder dystocia was recognized and that the McRoberts maneuver and supra-pubic pressure were performed, as well as the two separate

---

[12]     Dr. Edelberg has been retired from the clinical practice of medicine since 2008 but delivered approximately ten thousand babies over the course of his career. (Tr. 206, 207, 239-40.)

[13]     Dr. Finkelstein is board certified in obstetrics and gynecology and has delivered approximately 5,000 babies over the course of his career, including roughly one hundred babies involving shoulder dystocia. (Tr. 355-57.)

nursing notes corroborating Dr. Jaber's delivery note. (Id. at 363-64, 375-76; see also Ex. A at D 35, D 36, D 55.)

Further, Dr. Finkelstein noted that both of the contemporaneous nursing notes state that Dr. Jaber was "assisted" by Dr. Rosenberg. (Tr. 363; see also Ex. A at D 35, D 55.) Dr. Finkelstein stated that in an uncomplicated delivery, no assistance by another physician would be noted, whereas in a delivery involving shoulder dystocia, an attending physician such as Dr. Jaber would require assistance from others in order to perform the McRoberts maneuver and apply supra-pubic pressure. (Tr. 363-64.) Dr. Finkelstein therefore concluded that the two separate nursing notes indicating "assistance" corroborate Dr. Jaber's contemporaneous delivery note because had shoulder dystocia been unrecognized and the obstetrical team failed to perform the appropriate maternal maneuvers, no assistance would have been documented. (See id.)

Dr. Finkelstein acknowledged that he could not reconcile his conclusions that the McRoberts maneuver and supra-pubic pressure were performed with Ms. Sinti's unequivocal testimony that no one moved her daughter's legs or applied pressure to her daughter's abdomen at any time during the delivery. (Id. at 366.) However, Dr. Finkelstein observed that in this case, the draping of the patient may have prevented Ms. Sinti from observing the use of these maneuvers. (See id.)

Specifically, Dr. Finkelstein noted that because the draping here covered Ms. Kawache's legs, and because it is possible when a patient is already in the lithotomy position to perform the McRoberts maneuver simply by sliding the patient's legs back along the stirrup pads until the feet are resting on the pads, the movement may not have been obvious to an observer in Ms. Sinti's position. (Id. at 366.) Similarly, Dr. Finkelstein testified that because an assistant performing supra-pubic pressure would need to apply the pressure "directly on the skin just above the pubic bone" and likely under the draping, Dr. Finkelstein noted that such a maneuver might not have been apparent to an observer in Ms. Sinti's position. (Id. at 489-90.)

### 2. The Court's Finding

Having considered all of the record evidence, the court finds that Dr. Jaber correctly identified shoulder dystocia during the delivery and that he and the obstetrical team performed the McRoberts maneuver and applied supra-pubic pressure. This finding is supported by the eyewitness and expert testimony as well as the contemporaneous medical records.

First, the eyewitness testimony supports this finding. Although Dr. Jaber testified that he had no personal recollection of the delivery here, he testified credibly based on the medical record and his usual practices when confronting

21

shoulder dystocia, which involved the use of the McRoberts maneuver and the application of supra-pubic pressure. Dr. Jaber further testified credibly based upon his review of the medical records that he abided by his usual practice in this case after recognizing shoulder dystocia during the delivery of Miriam Kawache.

Moreover, the remaining eyewitness accounts are not wholly incompatible with Dr. Jaber's account. Ms. Kawache's deposition testimony revealed that she had no recollection of the delivery. Additionally, the court recognizes that Ms. Sinti's testimony appears to contradict Dr. Jaber to the extent that she stated that she did not observe anyone moving her daughter's legs or applying pressure to her daughter's abdomen. Nonetheless, although this court has no doubt that Ms. Sinti testified truthfully and in good faith, the court does not credit that portion of Ms. Sinti's testimony for several reasons and finds that the remainder of her testimony is not inconsistent with Dr. Jaber's account of the delivery.

First, it appears likely from the record that Ms. Sinti did not have an opportunity to observe the maternal maneuvers being performed. Indeed, Ms. Sinti herself acknowledged that she was standing to the left side of her daughter at the level of her daughter's abdomen, that her daughter was draped during the delivery, and that Ms. Sinti had

no view of the "birthing area" during the delivery.
Additionally, according to the medical records, Ms. Kawache was
draped and already in the lithotomy position from the outset of
the delivery. Thus the preponderance of the evidence
establishes a strong probability that Ms. Sinti may have failed
to observe when Ms. Kawache's draped legs were slid back toward
her chest along the stirrup pads during the mere seconds it
required to perform this maneuver. Similarly, the combination
of the draping and Ms. Sinti's positioning on the left side of
her daughter's abdomen establish by a preponderance of the
evidence that Ms. Sinti may have been unable or simply failed to
observe that an assistant was applying supra-pubic pressure to
her daughter's abdomen.

Alternatively, even if Ms. Sinti had observed these
actions occurring, she may have failed to recognize the
significance of the obstetrical maneuvers given her lack of
medical training. This is particularly likely given that Ms.
Sinti was under the severe stress of attending to her daughter
during the entire delivery in the absence of her daughter's
husband, while knowing that her daughter's home and family had
suffered a fire that morning. Thus, despite Ms. Sinti's best
intentions, it is more likely than not that she failed to either
observe or comprehend the obstetrical maneuvers that were
occurring during the delivery, or that her memory or perception

of the delivery may simply be inaccurate given the stress of the situation.

Moreover, the remainder of Ms. Sinti's testimony – that the delivery was proceeding normally, that there appeared to be a pause, and immediately following the pause the baby was born – is consistent with Dr. Jaber's testimony that he recognized shoulder dystocia, directed that certain maneuvers be performed and then waited to see if the maneuvers would successfully dislodge the shoulder, following which the baby was born approximately one to one and one half minutes later. The court thus credits the testimony of Ms. Sinti, including that she did not observe any maternal maneuvers being performed during the delivery. So qualified, the available eyewitness testimony and medical records support the finding that the proper maternal maneuvers that were performed in this case.

Second, in multiple places the contemporaneous medical records prepared by both Dr. Jaber and other medical professionals corroborate Dr. Jaber's testimony that he followed that typical procedure in this case. Specifically, as discussed and explained further by Dr. Finkelstein, Dr. Jaber's own delivery note indicates that he recognized shoulder dystocia and performed the appropriate maneuvers, two additional nurses notes indicate that shoulder dystocia was confronted during the delivery, and the nursing notes further indicate that

"assistance" was provided to effectuate the delivery thereby further corroborating the fact that maternal maneuvers were performed during Miriam's delivery.

Finally, although plaintiffs stress the absence of any entry by the delivery nurse noting that the McRoberts maneuver was performed or that supra-pubic pressure was applied, the court finds that plaintiffs failed to present any evidence that the absence of such entries by a nurse tracking primarily medication dosages is indicative that the maneuvers were not performed. Moreover, to reject the accuracy of these contemporaneous medical records would require this court to find that not only did Dr. Jaber willfully and knowingly falsify the records, but that he did so in concert with the other medical staff on duty. Plaintiffs have failed to present any evidence to support such a finding. The court thus finds the contemporaneous medical records credible as they are written and finds that these records further corroborate Dr. Jaber's account.

Third and finally, the expert medical opinions of both plaintiffs' and defendant's ob/gyn experts support a finding that shoulder dystocia was recognized and the proper maternal maneuvers were performed in this case. As discussed, both Drs. Finkelstein and Edelberg testified as to their expert medical opinions that, according to the medical records, the shoulder

dystocia was recognized and the maternal maneuvers were performed.

The court thus credits the testimony provided by Dr. Jaber and both ob/gyn experts, as well as the accuracy of the contemporaneously created medical records, and finds that shoulder dystocia was recognized and that the McRoberts maneuver and supra-pubic pressure were performed during the delivery of Miriam Kawache.

## C. Diagnosis of Injury

There is no dispute that Miriam Kawache was diagnosed with a right brachial plexus injury shortly after birth. (PTO ¶ 8(e).) Specifically, the pediatric staff indicated in a progress note on December 12, 2005 at 7:30 p.m. that Miriam had a decreased range of motion in her right upper extremity (RUE). (Ex. A at D 117.) A clavicle (collar bone) x-ray ordered by the pediatrics staff revealed no fractures, however. (Ex. A at D 144.) The following day, on December 13, 2005, the attending pediatrician diagnosed Miriam with "a possible right Erb's palsy," which is also known as a brachial plexus injury. (Tr. at 160; Ex. A at D 129.) A consulting pediatric neurologist determined that no EMG was needed but that an outpatient follow-up should occur within one to two weeks and physiotherapy should begin as soon as possible. (Ex. A at D 129-30.)

Based upon the course of Miriam's early recovery, the lack of any surgical exploration of the injury, and the results of an MRI, the medical experts agreed that there is no evidence that Miriam suffered an avulsion, which occurs when the nerves of the brachial plexus are pulled out at the root from the spinal cord resulting in the loss of function of the arm and hand. (Tr. 181, 183, 315-16, 319.) Rather, the record establishes that Miriam suffered a stretch injury to her brachial plexus, meaning that some of the nerves of her brachial plexus were stretched. (Id.)

**D. Causes of the Brachial Plexus Injury**

Defendant's ob/gyn expert, Dr. Finkelstein, as well as plaintiffs' ob/gyn expert, Dr. Edelberg, and plaintiffs' pediatric neurologist expert, Dr. Greg Rosenn ("Dr. Rosenn"),[14] each offered expert opinions to a reasonable degree of medical certainty as to the causes of Miriam Kawache's brachial plexus injury. (See, e.g., id. at 166, 225, 200-01, 469.)

Dr. Finkelstein opined that Miriam Kawache's brachial plexus injury did not occur because of the application of excessive lateral traction during delivery; indeed, Dr. Finkelstein opined that no lateral traction was applied in this case. (Tr. 363, 383, 475, 491-92.) Rather, Dr. Finkelstein opined that the brachial plexus injury in this case was caused

---

[14]    Dr. Rosenn is board certified in pediatrics and neurology with special qualifications in child neurology. (Tr. 155.)

by the endogenous forces of labor coupled with the impaction of the shoulders against the mother's bone structure itself during the delivery. (Id. at 383, 475, 491-92.) Dr. Finkelstein based his opinion on the eyewitness testimony, the medical records, the post-delivery condition of the baby, the nature of injury itself, and peer-reviewed medical literature which provides an explanation for the injury alternative to the use of excess traction.

First, with respect to eyewitness testimony, Dr. Finkelstein noted that the attending physician himself, Dr. Jaber, credibly denied applying excess traction, and no eyewitness testimony contradicted him. (Id. at 95.) Indeed, the lone additional eyewitness who testified at trial, Ms. Sinti, did not report observing any application of excess force, nor did she observe Dr. Jaber's hands ever touching the baby's head. (Id. at 128.) Specifically, Ms. Sinti did not testify to observing Dr. Jaber straining to deliver the baby, and she did not testify to observing any pushing, pulling, or twisting, or any other indicia that Dr. Jaber applied excessive traction to the baby's head. (See id. at 371-74.)

Moreover, Dr. Finkelstein noted that the amount of force involved in "excessive lateral traction" is "not minimal," and further testified that in the course of his expert experience reviewing cases of brachial plexus injuries, in cases

where excess force occurs, observers often describe "physical actions by the delivery physician . . . consistent with excessive lateral traction." (Id. at 372-74.) Such actions might include the doctor placing one foot on the table and pulling back, violently pulling, or twisting and rotating of the baby's head. (Id.) Here, by contrast, no such testimony was offered by plaintiffs.

Second, Dr. Finkelstein noted that there is no evidence in the medical records that any excess traction was applied. The delivery records contain no mention of anyone pulling or twisting the baby's head. (See generally Ex. A.)

Third, Dr. Finkelstein relied on the post-delivery condition of the baby which provided no indication that excess traction was applied. Dr. Finkelstein testified that cases involving excess lateral force usually result in some "bruising of the baby." (Tr. 372.) However, in this case, neither the medical records nor any eyewitness testimony indicate that the baby was bruised on any part of her body at birth. (See generally Tr.; see also Ex. A.)

Fourth, Dr. Finkelstein noted that the nature of Miriam Kawache's injury is inconsistent with the application of excess lateral traction during an ROA delivery. Thus, because Miriam delivered in the ROA position, her left, anterior shoulder was stuck behind the mother's pubic bone, and her

right, posterior shoulder was stuck behind the mother's tail bone. (Tr. 361.) If, hypothetically, Dr. Jaber had applied excessive downward traction as alleged by plaintiffs, the traction would have affected the brachial plexus on Miriam Kawache's left side, resulting in an injury to her left arm. (Id. at 414.) Here, however, Miriam suffered a right brachial plexus injury. (Id. at 360.) Dr. Finkelstein opined that it is therefore impossible for Dr. Jaber to have caused Miriam's brachial plexus injury through the application of excessive downward traction. (Id. at 414, 464.)

Finally, Dr. Finkelstein cited peer-reviewed medical literature as the basis for his expert opinion that instead of excessive lateral traction, Miriam's brachial plexus injury was caused by the endogenous forces of labor coupled with the impact of the shoulders against the mother's bone structure when the shoulder dystocia occurred. (Id. at 383, 475, 491-92.) Specifically, Dr. Finkelstein described how Ms. Kawache's uterus did not cease contracting when Miriam's shoulders became stuck, and that the ensuing contractions while the baby was lodged against the mother's bone structures (pubic bone and tail bone) exerted force on both sides of Miriam's neck and resulted in an injury to her right brachial plexus. (Id. at 475, 491-92.) Dr. Finkelstein further explained that the peer-reviewed medical literature supports his opinion because it documents "recorded

cases of permanent stretch injuries that can and do occur without any excessive lateral traction by the delivering health care provider." (Id. at 361-62.) Such reported cases include instances where permanent brachial plexus injuries occur even following uncomplicated cesarean deliveries where no excess traction was used to extract the baby from the uterus, and in one case, a spontaneous vaginal delivery where the doctor did not apply any lateral traction to the infant's head. (Id. at 361-62, 393; see also Def. Mem. at 23-25 (citing and discussing specific peer-reviewed medical journals relied upon by Dr. Finkelstein).)

Plaintiffs' ob/gyn expert Dr. Edelberg opined that Miriam's brachial plexus injury was caused by excess traction during the management of shoulder dystocia. (Tr. 225, 231.) Dr. Edelberg testified that his opinion was based upon solely the medical records, the process of differential diagnosis, and the fact of the injury.

First, Dr. Edelberg testified that in reaching his expert opinion, he relied solely on the medical records. (Id. at 242. 244-45.) However, Dr. Edelberg acknowledged that in this case nothing in the medical records indicated a departure from the standard of care or that Dr. Jaber applied excess traction during the delivery of Miriam Kawache. (Id. at 252.)

Second, Dr. Edelberg testified that in order to reach his expert conclusion he utilized a differential diagnosis in order to rule out "all other causes of a brachial plexus injury." (Id. at 222-24.)  Thus, on cross-examination Dr. Edelberg first testified that in this case he had specifically ruled out that Miriam's injury was caused by the endogenous forces of labor, defined as the sheer forces of labor pushing the baby through the birth canal.  (Id. at 252.)  However, on further cross-examination, Dr. Edelberg acknowledged that in a previous medical malpractice case involving a child with a permanent brachial plexus injury, D'Amore v. Cardwell, 2008 WL 852791 (Ohio Ct. App. 6 Dist. Mar. 31, 2008), he had admitted that he could not entirely rule out endogenous forces of labor as a cause for a permanent brachial plexus injury.  (Tr. 253.)  Dr. Edelberg then admitted that he also could not rule out the possibility that the sheer forces of labor had caused Miriam's brachial plexus injury in this case.  (Id. at 251, 253-54.)

Finally, Dr. Edelberg first opined that the very fact that Miriam suffered a permanent brachial plexus injury indicated that excess lateral traction was employed in this case.  (Id. at 231.)  Yet Dr. Edelberg admitted that "the fact that Miriam Kawache has a permanent brachial plexus injury does not mean automatically that there was a departure from the standard of care."  (Id. at 251.)

In opining that the fact of the permanent brachial plexus injury alone indicates the use of excessive force during delivery here, Dr. Edelberg dismissed a peer-reviewed article relied upon by Dr. Finkelstein which was published in The American Journal of Obstetrics and Gynecology, a medical journal Dr. Edelberg admitted to regularly reading. (See id. at 255-56.) Specifically, Dr. Edelberg dismissed an article entitled "Permanent Brachial Plexus Injury Following Vaginal Delivery Without Physician Traction or Shoulder Dystocia" authored by Dr. Henry Lerner of Harvard Medical School and Dr. Eva Salomon ("Lerner article"), which found that a permanent brachial plexus injury can occur even absent excessive lateral traction. (Id.; see also id. at 362, 397.) In dismissing the peer-reviewed Lerner article, Dr. Edelberg charged Drs. Lerner and Salomon with bias and misstating the facts in the article. (Id. at 255-56.) However, the court finds that Dr. Edelberg could not support his assertions and indeed, retreated from them on cross-examination. (See id. at 257, 266-69.) Therefore, the court finds Dr. Edelberg's proffered reasons for dismissing the Lerner article unpersuasive. (See id.)

Plaintiffs' pediatric neurologist expert Dr. Rosenn also opined that Miriam's permanent brachial plexus injury was caused by the application of excessive lateral force to the infant's head during delivery. (Id. at 171.) According to Dr.

33

Rosenn, the basis for his expert opinion is the fact that Miriam's brachial plexus injury is permanent. (Id. at 171-72.)

However, Dr. Rosenn admitted that as a pediatric neurologist, the only circumstance in which he forms an opinion as to the cause of a brachial plexus injury is when he is being paid as a legal expert, because his medical expertise is concerned with diagnosing and treating brachial plexus injuries, and not with determining the causes of such injuries. (Id. at 168-69.) Moreover, Dr. Rosenn admitted that it was "definitely possible" for a permanent brachial plexus injury to be caused by something other than excess traction, and he acknowledged the reported cases in the medical literature documenting permanent brachial plexus injuries even where there was no opportunity for the delivering physician or anyone else to apply excess traction to the baby's head. (Id. at 198-99.)

Having considered the qualifications of the experts and all of the expert testimony, the court credits the expert opinion of Dr. Finkelstein. The court therefore finds for the reasons clearly and credibly articulated by Dr. Finkelstein, and consistent with the medical records in this case and the peer-reviewed medical literature appearing in authoritative sources in the field of obstetrics and gynecology, that plaintiffs have failed to prove that excess lateral traction was applied in this case. Rather, the court credits Dr. Finkelstein's testimony,

based on the record and peer-reviewed literature, that Miriam Kawache's right brachial plexus injury was caused by the endogenous forces of labor in combination with the shoulder dystocia itself. In this regard, the court notes that neither of plaintiffs' experts could rule out or refute this explanation for the injury here. Further, to the extent that Dr. Edelberg and Dr. Rosenn disagree with Dr. Finkelstein's expert opinion, the court did not find their testimony credible, for the reasons explained above.

**E. Current Status and Treatment**

Neither party disputes that Miriam Kawache suffers from a permanent brachial plexus injury affecting the range of motion in her right arm and shoulder resulting in moderate motor and functional deficits. (See, e.g., Tr. 165-66, 289-94, 309, 326.) Specifically, according to plaintiffs' pediatric neurologist expert Dr. Regina DeCarlo ("Dr. DeCarlo"),[15] Miriam's permanent right brachial plexus injury physically limits her ability to fully straighten her right arm, to fully supinate (turn with palm facing upwards) her right arm, raise her right arm above her head, and reach her right arm behind her back. (Id.; see also Def. Mem. at 29-34 (detailing testimony concerning the extent of Miriam's physical limitations).)

---

[15] Dr. DeCarlo is board certified in pediatrics and neurology with a special qualification in child neurology who has been practicing as a pediatric neurologist since 1984. (Tr. 273-275.) Plaintiffs do not dispute Dr. DeCarlo's findings. (See id. 529.)

Functionally, the evidence showed that Miriam is able to perform age-appropriate functions of daily life such as catching a ball, riding a tricycle, grooming her hair, and eating normally with utensils, but may have difficulty with some tasks. (Id. at 130-31, 191-92, 311, 320-24.) Plaintiffs have further stipulated that the only injury alleged is to Miriam's right arm. (Tr. at 281-82.)

During trial, Miriam appeared in the courtroom appeared appropriately reserved for a child her age in an unfamiliar environment with unfamiliar individuals. When asked to run back and forth across the room, her right arm stayed in a slightly contracted position. (See Tr. 151-53.) Miriam was also unable to reach her right arm completely over her head when requested, and instead, was only able to reach approximately to the level of her head. (See id.) A videotaped recording prepared in March 2009, approximately fourteen months prior to trial, depicted Miriam Kawache with an occupational therapist at The Hospital for Special Surgery. (See, e.g., Tr. at 535, 541; Ex. H 2.) In the video, Miriam appeared as a far more relaxed child engaging in various tasks and revealing similar limitations to those evidenced in court. (See Ex. H 2.)

**F. Lack of Evidence on Damages**

Plaintiffs did not present any testimony concerning Miriam's future medical needs and associated costs, or her

future ability to obtain employment.  Plaintiffs did not present

any evidence that Miriam's permanent brachial plexus injury has

caused Miriam emotional harm.


## CONCLUSIONS OF LAW

### A. FTCA and Medical Malpractice

Under the FTCA, the United States is liable in the

same manner as a private person for the tortious acts or

omissions of its employees acting within the scope of their

employment "in accordance with the law of the place where the

act or omission occurred."  28 U.S.C. § 1346(b)(1); see also

Molzof v. United States, 502 U.S. 301, 305 (1992) ("the extent

of the United States' liability under the FTCA is generally

determined by reference to state law") (citations omitted).

Accordingly, a federal court presiding over an FTCA claim must

apply "the whole law of the State where the act or omission

occurred."  Richards v. United States, 369 U.S. 1, 11 (1962);

see also Bernard v. United States, 25 F.3d 98, 102 (2d Cir.

1994) ("State law applies to an FTCA claim.").  Further, state

law applies to the United States in an FTCA claim in the same

manner it would apply to a private person, such that the United

States may not be held to a stricter standard of care than would

apply to a private defendant under similar circumstances, see 28

U.S.C. § 1346(b)(1), nor subject to strict liability, <u>Laird v.</u>
<u>Nelms</u>, 406 U.S. 797, 803 (1972).

Because the birth injury at issue here occurred in New
York, the law of the State of New York applies.  Under New York
law, to establish a medical malpractice claim a plaintiff must
prove by a preponderance of the evidence: "(1) the standard of
care in the locality where the treatment occurred; (2) that the
defendants breached that standard of care; and (3) that the
breach of the standard was the proximate cause of injury."  <u>See,</u>
<u>e.g.</u>, <u>Berger v. Becker</u>, 272 A.D.2d 565, 565 (N.Y. 2d Dep't
2000).  Under the first element, the general standard of care
for physicians in New York is well established and requires a
physician to "exercise that reasonable degree of learning and
skill that is ordinarily possessed by physicians . . . in the
locality where he practices . . . . The law holds [the
physician] liable for an injury to his patient resulting from
want of the requisite knowledge and skill, or the omission to
exercise reasonable care, or the failure to use his best
judgment."  <u>United States v. Perez</u>, 85 F. Supp. 2d 220, 226
(S.D.N.Y. 1999) (<u>quoting</u> <u>Pike v. Honsinger</u>, 155 N.Y. 201 (N.Y.
1898)); <u>see also</u> <u>Sitts v. United States</u>, 811 F.2d 736, 739-40
(2d Cir. 1987).  In addition, it is well-established that each
element must be established by expert medical opinion unless the
deviation from a proper standard of care is so obvious as to be

within the understanding of an ordinary layperson.  See, e.g.,
Sitts, 811 F.2d at 739-40 (noting that "in the view of the New
York courts, the medical malpractice case in which no expert
medical testimony is required is 'rare'") (citation omitted);
see also Fiore v. Galang, 64 N.Y.2d 999, 1000-01 (N.Y. 1985)
("except as to matters within the ordinary experience and
knowledge of laymen, in a medical malpractice action, expert
medical opinion evidence is required to demonstrate merit").

     To establish a fact by a preponderance of the
evidence, a plaintiff must "prove that the fact is more likely
true than not true."  See Fischl v. Armitage, 128 F.3d 50, 55
(2d Cir. 1997) (quotation and citation omitted).  Moreover,
because the plaintiff bears the burden of proof on claims of
negligence, the mere fact that a medical procedure is
unsuccessful or results in a negative outcome will not support a
claim for negligence.  Perez, 85 F. Supp. 2d at 227, (citing
Sitts, 811 F.2d 736).

**B. Application**

     There is no dispute here that Miriam Kawache suffers
from a permanent brachial plexus injury and that she sustained
that injury at birth.  The parties dispute the cause of that
injury and whether Dr. Jaber breached the applicable standard of
care.  The court concludes that plaintiffs have failed to prove
by a preponderance of the evidence that Dr. Jaber breached the

standard of care during Miriam's delivery and caused Miriam

Kawache's permanent brachial plexus injury.  Specifically,

plaintiffs failed to prove that Dr. Jaber did not recognize or

appropriately treat shoulder dystocia by employing the

appropriate maternal maneuvers.  Further, plaintiffs failed to

prove that Dr. Jaber applied excess lateral traction during the

delivery, and as such, plaintiffs' theories of causation are

unsupported by the evidence in the record.

First, as explained above, all the evidence –

including the eyewitness[16] and expert testimony and

contemporaneous medical records – support the court's finding

that when Miriam Kawache's head first crowned during delivery

and the turtle sign appeared indicating shoulder dystocia, Dr.

Jaber appropriately recognized shoulder dystocia and performed

the proper maternal maneuvers with the assistance of the

obstetrical team in order to successfully complete the delivery

in accordance with the applicable standard of care.  Indeed,

plaintiffs' own medical expert, Dr. Edelberg, acknowledged that

based on the medical records, it was his expert medical opinion

that the maternal maneuvers, including the McRoberts maneuver

and supra-pubic pressure, were employed in this case.  Moreover,

given the evidence in the record, this concession by plaintiffs'

---

[16]    As discussed and explained above, that portion of Ms. Sinti's
eyewitness testimony in which she stated that she did not observe any
maternal maneuvers being performed during Miriam's delivery can be reconciled
with the record.

own medical expert that maternal maneuvers were performed, and having failed to proffer any other expert testimony establishing by a preponderance that Dr. Jaber breached the standard of care by failing to recognize and appropriately treat shoulder dystocia, to the extent plaintiffs' claim is based upon Dr. Jaber's alleged failure to recognize shoulder dystocia and properly treat the condition using the maternal maneuvers, plaintiffs have failed as a matter of law to establish medical malpractice under New York law.  See, e.g., Sitts, 811 F.2d at 740 (noting that, except in a rare case, each element of medical malpractice claim must be established by expert medical opinion and holding that where such required expert medical evidence is not proffered, "the defendant is entitled to judgment as a matter of law").

Second, and again as explained above, plaintiffs have failed to establish by a preponderance that Dr. Jaber applied excessive lateral traction to the infant's head at the moment the head crowned during the delivery in a breach of the applicable standard of care.  Rather, as explained above, Dr. Jaber's credible testimony that he did not apply excess traction, the lack of contradictory medical records or eyewitness testimony, and the credible alternative explanation for Miriam Kawache's permanent brachial plexus injury provided by Dr. Finkelstein's expert testimony and the peer-reviewed

medical literature,[17] together support the court's finding that
Miriam Kawache's injury was not caused by the application of
excess lateral traction, but instead, was caused by the
endogenous forces of labor.

Thus, although Miriam Kawache indisputably suffered a
permanent birth injury, and although this court is certainly
sympathetic to this child and her family, the evidence simply
does not establish that Dr. Jaber more likely than not breached
the standard of care and caused the brachial plexus injury.  To
the contrary, the evidence established that Dr. Jaber met the
standard of care in all respects.  The United States is
therefore not liable.  Because liability has not been
established, there is no need to address the issue of damages.

---

[17]    As noted above, neither of plaintiffs' experts could rule out or refute
the explanation that Miriam Kawache's permanent brachial plexus injury was
caused by the endogenous forces of labor. (See, e.g., Tr. at 198-99, 251,
253-54.)  Further, for the reasons explained above, to the extent that Dr.
Edelberg and Dr. Rosenn disagreed with Dr. Finkelstein's expert opinion and
the peer-reviewed medical literature Dr. Finkelstein relied on in forming
that opinion, the court did not find the testimony of Drs. Edelberg and
Rosenn credible.

## CONCLUSION

Based upon the preceding findings of fact and conclusions of law, it is hereby ordered that plaintiff take nothing of the defendant. The Clerk of the Court is respectfully requested to enter judgment in favor of defendant and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
        February 7, 2011

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York